**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OLYMPIC AND PARALYMPIC
COMMITTEE,

                                         Civil Action No.: 1:24-cv-08526

       Plaintiff,

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

       Defendants.

## COMPLAINT

Plaintiff, United States Olympic and Paralympic Committee (the "USOPC" or "Plaintiff"), hereby files this Complaint against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and hereby alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220506(a) (the "Ted Stevens Act"), the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., 28 U.S.C. § 1338(a)–(b), and 28 U.S.C. § 1331.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial internet stores operating under the Defendant Internet Stores and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents

1

by operating one or more commercial, interactive internet stores through which Illinois residents can purchase products bearing counterfeit versions of Plaintiff's trademarks. Each of the Defendants has targeted sales from Illinois residents by operating internet stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold products bearing counterfeit versions of Plaintiff's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

## INTRODUCTION

3.      This action has been filed by Plaintiff to combat online counterfeiters who trade upon Plaintiff's reputation and goodwill by selling and/or offering for sale products in connection with Plaintiff's Olympic Trademarks, which are covered by U.S. Trademark Registration Nos. 968,566; 2,455,565; 2,774,352; 2,777,890; 3,848,800; 4,368,709; 4,368,710; 4,368,711; 4,368,713; 4,368,714; 4,372,689; 4,662,320; 4,841,553; 4,867,243; 4,867,244; 5,216,935; 5,743,425; 5,802,984; 6,050,531; and 6,383,408 (collectively the "Olympic Trademarks"). The registrations are valid, subsisting, unrevoked, and uncancelled. The registrations for the trademarks constitute prima facie evidence of validity and of Plaintiff's exclusive right to use the trademarks pursuant to the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220506(a), and 15 U.S.C. § 1057(b). Genuine and authentic copies of the U.S. federal trademark registration certificates for the Olympic Trademarks are attached as **Exhibit 1**. In addition to Plaintiff's registered trademarks, Congress granted the USOPC the exclusive right to use and control the use of Olympic terminology and imagery within the United States. *See* The Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220506(a).

4.      In the past, Plaintiff was able to police its marks against identifiable infringers and counterfeiters. The rise of online retailing, coupled with the ability of eCommerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken. The aggregated effect of the mass counterfeiting that is taking place has overwhelmed Plaintiff and its ability to police its rights against the hundreds of anonymous defendants which are selling illegal counterfeits at prices substantially below an original:

<u>ORIGINAL</u>



https://shop3.olympics.com/en/olympic-collection/x-3079

<u>COUNTERFEIT</u>



5.     The above example evidences a cooperative counterfeiting network using fake eCommerce storefronts designed to appear to be selling authorized products. To be able to offer the counterfeit products at a price substantially below the cost of the original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising, and shipping, requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.
>
> . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to

manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.

. . .

Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 2**.

6. The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables counterfeiters to stymie authorities:

The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.

. . .

A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.

. . .

Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut

down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

7.      eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform. It formed a special task force that worked in conjunction with Chinese authorities for a boots-on-the-ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20                                    

BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

*See* Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm  (**Exhibit 3**)

8.      Plaintiff has been and continues to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and goodwill, as well as loss of control over the quality of goods bearing the Olympic Trademarks. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in its products to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.
> …
> The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.
> . . .
> Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.
> . . .
> Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 2**) at 4, 8, 11.

9.      Not only are the creators and brand holders harmed, but the public is harmed as well:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.

The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. <u>This illicit trade must be stopped in its tracks</u>.

*Id.* at 3, 4. (Underlining in original).

10.     Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, Schedule A shows the use of store names by the Defendant Internet Stores that employ no normal business nomenclature and, instead, have the appearance of being made up, or, if a company that appears to be legitimate is used, online research shows that there is no known address for the company. Thus, the Defendant Internet Stores are using fake online storefronts designed to appear to be selling genuine Plaintiff's products, while selling inferior imitations of Plaintiff's products. The Defendant Internet Stores also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of Plaintiff's registered trademarks, as well as to protect unknowing consumers from purchasing unauthorized Olympics Products over the internet.

11.     This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and this judicial district, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and this

judicial district. In addition, each Defendant has offered to sell and ship infringing products into this judicial district.

## THE PLAINTIFF

12.     The USOPC serves as both the National Olympic Committee ("NOC") and the National Paralympic Committee for the United States. In its role as NOC, the USOPC promotes the tenets of Olympism, as embodied in the Olympic Charter. Such tenets include the practice of sport without discrimination, and competition with a spirit of goodwill, solidarity, and fair play. The USOPC serves as a steward for the Olympic and Paralympic movements in the United States and is responsible for fielding U.S. teams for the Olympic, Paralympic, Youth Olympic, Pan American, and Parapan American Games.

13.     The USOPC exists to empower Team USA athletes to achieve sustained competitive excellence and well-being. Approximately 82% of the USOPC's budget has a direct impact on its mission of supporting athletes via a variety of programs for both athletes and their National Governing Bodies. In addition to performance grants and rewards, additional support is provided in the form of training facilities, sports medicine and science, coaching education, health insurance, promotional opportunities, education and career services, outfitting and travel, and safe sport and anti-doping programming.

14.     Additionally, the USOPC oversees the process by which U.S. cities bid to host the Olympic and Paralympic Games, the Youth Olympic Games, or the Pan and Parapan American Games, while also playing a supporting role in the bid processes for hosting a myriad of other international competitions. Further, the USOPC approves the U.S. trials sites and procedures for the Olympic, Paralympic, Youth Olympic, Pan American, and Parapan American Games team selections.

15.     As set forth in the Olympic Charter, the USOPC is obligated to protect Olympic intellectual property in the United States for the benefit of the Olympic Movement. In recognition and furtherance of the scope of the USOPC's responsibilities and undertakings, Congress granted the USOPC the exclusive right to use and control the use of Olympic terminology and imagery within the United States. See The Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220506(a).

16.     The Ted Stevens Act authorizes the USOPC to file a civil action against the unauthorized use "for the purpose of trade, to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition…[of] any trademark, trade name, sign, symbol, or insignia falsely representing association with, or authorization by" the USOPC or its affiliates. 36 U.S.C. § 220506(c).

17.     The intent of Congress in granting the USOPC exclusivity over the Olympic brand was to generate revenue to finance the United States' involvement in the Olympic Games. Although Congress charged the USOPC with the responsibility to finance U.S. participation in the Olympics, the USOPC does not receive financial assistance from the United States Government. See U.S. Olympic Comm. v. Intelicense Corp., S.A., 737 F.2d 263, 266 (2d Cir. 1984) ("the USOC is the only NOC [National Olympic Committee] that does not receive formal financial assistance from the Government" (emphasis added)).

18.     As the United States Supreme Court has explained, the unambiguous intent of Congress in granting the USOPC exclusivity over the Olympic brand is to generate revenue to finance the United States' involvement in the Olympic Games. See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm., 483 U.S. 522 (1987). "[I]t is clear that the Congressional intent in enacting [the Act] was to promote the United States Olympic effort by entrusting the USOC with

unfettered control over the commercial use of Olympic-related designations" to "facilitate the USOC's ability to raise those financial resources from the private sector that are needed to fund the United States Olympic Movement." Intelicense Corp., 737 F.2d at 266.

19.     The USOPC raises the money it needs to operate by, in large part, licensing use of its intellectual property to sponsors and licensees. These legitimate license fees pay to house, feed, train, and otherwise support U.S. Olympic athletes, and finance this country's participation in the Olympic Games.

20.     Plaintiff owns several federal trademark registrations on the Principal Register, including the following registrations (Exhibit 1):

| Trademark | Registration No. |
|---|---|
| OLYMPIC | 968,566; 2,777,890; 4,841,553 |
| TEAM USA | 2,455,565; 2,774,352; 3,848,800; 4,368,709; 4,368,710; 4,368,411; 4,368,713; 4,368,714; 4,372,689; 4,867,243; 4,867,244 |
| TOKYO 2020 | 4,662,320 |
|  | 5,216,935 |
|  | 5,743,245 |
| BEIJING 2022 | 5,802,984 |
| PARIS 2024 | 6,050,531 |

|  | 6,383,408 |
| --- | --- |

21.     Plaintiff's use and registrations of the Olympic Trademarks create trademark rights in the Olympic Trademarks that are subject to enforcement under the Ted Stevens Act and the Lanham Act.

22.     Plaintiff's brand, symbolized by the Olympic Trademarks, is a recognized symbol of high-quality merchandise. The Olympic Trademarks are distinctive and identify the merchandise as goods from the Plaintiff. The registrations for the Olympic Trademarks constitute prima facie evidence of their validity and of Plaintiff's exclusive right to use the Olympic Trademarks pursuant to 15 U.S.C. § 1057 (b).

23.     The Olympic Trademarks have been continuously used and never abandoned.

24.     Plaintiff has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the Olympic Trademarks. As a result, products bearing the Olympic Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from Plaintiff.

**THE DEFENDANTS**

25.     Defendants are individuals and business entities who, upon information and belief, primarily reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this judicial district, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online

retailers, outlet stores, or wholesalers selling genuine Olympic Products. Each Defendant targets the United States, including Illinois, and offered to sell and, on information and belief, sold, and continues to sell counterfeit Olympic Products to consumers within the United States, including Illinois and in this judicial district.

## THE DEFENDANTS' UNLAWFUL CONDUCT

26.     The success of the Olympic brand has resulted in its significant counterfeiting. Defendants conduct their illegal operations through fully interactive commercial websites hosted on various eCommerce sites. Each Defendant targets consumers in the United States, including the State of Illinois, and offered to sell and, on information and belief, sold and continues to sell counterfeit products that violate Plaintiff's intellectual property rights ("Counterfeit Products") to consumers within the United States, including the State of Illinois.

27.     The Defendant Internet Stores intentionally conceal their identities and the full scope of their counterfeiting operations in an effort to deter Plaintiff from learning Defendants' true identities and the exact interworking of Defendants' illegal counterfeiting operations. Through their operation of the Defendant Internet Stores, Defendants are directly and personally contributing to, inducing, and engaging in the sale of counterfeit products as alleged, oftentimes as partners, co-conspirators, and/or suppliers. Upon information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell counterfeit products.

28.     Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of Plaintiff's ownership of the Olympic Trademarks, including its exclusive right to use and license such intellectual property and the goodwill associated therewith.

29.    Defendants often go to great lengths to conceal their identities by often using multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. Defendants also appear to intentionally omit accurate contact information when registering their respective stores. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using at least the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

30.    The counterfeit Olympic Products for sale in the Defendant Internet Stores bear similarities and indicia of being related to one another, suggesting that the counterfeit Olympic Products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same store name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, metadata, illegitimate SEO tactics, HTML user-defined variables, lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

31.    In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States

once notice of a lawsuit is received. Rogue servers are notorious for ignoring takedown demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2021 U.S. Customs and Border Protection report on seizure statistics indicated that e-commerce sales accounted for 13.3% of total retail sales with second quarter of 2021 retail e-commerce sales estimated at $222.5 billion. U.S. Customs and Border Protection, Intellectual Property Right Seizure Statistics, FY 2021 (https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20-%20FINAL%20%28508%29.pdf) at 23. A true and correct copy of CBP's FY 2021 report is attached hereto as Exhibit 4. In FY 2021, there were 213 million express mail shipments and 94 million international mail shipments. Id. Nearly 90 percent of all intellectual property seizures occur in the international mail and express environments. Id. at 27. The "overwhelming volume of small packages also makes CBP's ability to identify and interdict high risk packages difficult." Id. at 23.

32.     Further, counterfeiters such as Defendants typically operate multiple credit card merchant accounts and third-party accounts, such as, without limitation, PayPal, Inc. ("PayPal") accounts, behind layers of payment gateways so that they can continue their operation in spite of Plaintiff's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal or other payment processor accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

33. Defendants' use of the Olympic Trademarks on or in connection with the advertising, marketing, distribution, offering for sale, and sale of the counterfeit products is likely to cause and caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff. Defendants have manufactured, imported, distributed, offered for sale, and sold counterfeit products using the Olympic Trademarks and continue to do so.

34. Defendants, without authorization or license from Plaintiff, knowingly and willfully used and continue to use the Olympic Trademarks in connection with the advertisement, offer for sale and sale of the counterfeit products, through, inter alia, the internet. The counterfeit products offered for sale by the Defendant Internet Stores are not genuine Olympic Products. Plaintiff did not manufacture, inspect, or package the counterfeit products and did not approve the counterfeit products for sale or distribution. The Defendant Internet Stores offer shipping to the United States, including Illinois, and, on information and belief, each Defendant has sold counterfeit products into the United States, including Illinois.

35. Upon information and belief, Defendants will continue to register or acquire listings for the purpose of selling counterfeit goods that infringe upon the Olympic Trademarks unless preliminarily and permanently enjoined.

36. Defendants' use of the Olympic Trademarks in connection with the advertising, distribution, offering for sale, and sale of counterfeit Olympic Products, including the sale of counterfeit Olympic Products into Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

**COUNT I**
**VIOLATION OF THE TED STEVENS OLYMPIC AND AMATEUR SPORTS ACT (36 U.S.C. § 220506)**

16

37.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

38.     Pursuant to The Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. §220506(c)(4), the USOPC may file a civil action against a person for the remedies provided in the Lanham Act if the person, without the consent of the USOPC, uses for the purpose of trade, to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition, any trademark, trade name, sign, symbol, or insignia falsely representing association with, or authorization by, the USOPC or its affiliates.

39.     As described above, Defendants are and intend to continue engaging in the unauthorized use in commerce of counterfeit imitations of the registered Olympic Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods, thereby falsely representing association with or authorization by Plaintiff, its affiliates, and/or the Olympic Games.

40.     Defendants' use of the Olympic Trademarks in connection with their counterfeit Olympic Products is likely to cause confusion, mistake, and deception among consumers as to the origin and quality of the products bearing counterfeit versions of the Olympic Trademarks, as consumers are likely to believe that Defendants' products and activities are authorized by, licensed or endorsed by, or associated with Plaintiff, its affiliates, and/or the Olympic Games.

41.     Defendants' conduct has been and continues to be willful, deliberate, and in bad faith, with malicious intent to trade on the goodwill associated with the Olympic Trademarks.

42.     By their conduct, Defendants have caused Plaintiff damage and irreparable injury for which it has no adequate remedy at law, and Defendants will continue to do so unless restrained

and enjoined by this Court from further infringing the Olympic Trademarks and confusing the public.

43.     On information and belief, Defendants have and will continue to receive revenues and profits as a result of their infringing use, to which Defendants are not entitled, and Plaintiff has suffered damages as a result of Defendants' unlawful conduct, for which Defendants are responsible.

**COUNT II**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

44.      Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

45.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered Olympic Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The Olympic Trademarks are highly distinctive. Consumers have come to expect the highest quality from Plaintiff's products provided under the Olympic Trademarks.

46.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the Olympic Trademarks without Plaintiff's permission.

47.     Plaintiff is the exclusive owner of the Olympic Trademarks. Plaintiff's United States Registrations for the Olympic Trademarks (Exhibit 1) are in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in the Olympic Trademarks and are willfully infringing and intentionally using counterfeits of the Olympic Trademarks. Defendants' willful, intentional, and unauthorized use of the Olympic Trademarks is

likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

48.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

49.     Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and to the goodwill of its well-known Olympic Trademarks.

50.     The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit Olympic Products.

**COUNT III**
**FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))**

51.     Plaintiff repeats and incorporates by reference herein the allegations contained in the above paragraphs of this Complaint.

52.     Defendants' promotion, marketing, offering for sale, and sale of counterfeit Olympic Products created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' counterfeit Olympic Products by Plaintiff.

53.     By using the Olympic Trademarks in connection with the sale of counterfeit Olympic Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit Olympic Products.

54.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit Olympic Products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

55.     Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1)   That Defendants, their affiliates, officers, agents, employees, attorneys, and all persons acting for, with, by, through, under, or in active concert with them be temporarily preliminarily, and permanently enjoined and restrained from:

a.   using the Olympic Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Olympic Product or is not authorized by Plaintiff to be sold in connection with the Olympic Trademarks;

b.   passing off, inducing, or enabling others to sell or pass off any product as a genuine Olympic Product or any other product produced by Plaintiff that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the Olympic Trademarks;

c.   committing any acts calculated to cause consumers to believe that Defendants' counterfeit Olympic Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d.   further infringing the Olympic Trademarks and damaging Plaintiff's goodwill;

e.   otherwise competing unfairly with Plaintiff in any manner;

f.  shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any Plaintiff's trademarks, including the Olympic Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof; and

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Internet Stores, or any other online marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit Olympic Products.

2)  That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiff a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through g, above;

3)  Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces, social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing, and Yahoo, web hosts for the Defendant Internet Stores, and online marketplace account registrars, shall:

a.  disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit Olympic Products using the Olympic Trademarks, including any accounts associated with the Defendants listed on Schedule A;

b.  disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit Olympic Products using the Olympic Trademarks; and

c. take all steps necessary to prevent links to the Defendant Internet Stores identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Internet Stores from any search index;

4) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Olympic Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Plaintiff be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the Olympic Trademarks;

6) That Plaintiff be awarded its reasonable attorneys' fees and costs;

7) Award any and all other relief that this Court deems just and proper.

DATED: September 17, 2024                    Respectfully submitted,

_/s/ Keith A. Vogt_
Keith A. Vogt (Bar No. 6207971)
Keith Vogt, Ltd.
33 West Jackson Boulevard, #2W
Chicago, Illinois 60604
Telephone: 312-971-6752
E-mail: keith@vogtip.com

**_ATTORNEY FOR PLAINTIFF_**